\

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELENA ELIZABETH OVANDO, | Case No. 1:21-cv-00030-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL |
| v. | (ECF Nos. 19, 20, 21) |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

## I.

## INTRODUCTION

Plaintiff Elena Elizabeth Ovando ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her concurrently submitted applications for Social Security benefits pursuant to Title II and Title XVI of the Social Security Act.   The matter is currently before the Court on the parties' briefs, which were submitted without oral argument, to Magistrate Judge Stanley A. Boone.[1]   For the reasons set forth below, Plaintiff's appeal shall be denied.

///

---

[1]   The parties have consented to the jurisdiction of the United States Magistrate Judge and this action has been assigned to Magistrate Judge Stanley A. Boone for all purposes.  (ECF Nos. 9, 11, 12.)

1

1

2

**II.**

**BACKGROUND**[2]

3     Plaintiff alleges disability based on spinal fusion, arthritis, high blood pressure, and

4 hernia.  (Admin. Rec. ("AR") 224, *collectively* ECF Nos. 14-3, 14-4, 14-5, 14-6, 14-7, 14-8, 14-9,

5 14-10, and 14-11.)

6     On December 14, 2017, Plaintiff concurrently filed applications for Social Security

7 benefits under Title II and Supplemental Security Income (SSI) under Title XVI, alleging

8 disability beginning April 1, 2017.  (AR 188–204.)  Plaintiff's claims were initially denied on

9 March 30, 2018, and denied upon reconsideration on July 6, 2018.  (AR 53–54, 77–78.)  On May

10 6, 2020, Plaintiff appeared via telephonic conference for an administrative hearing before

11 Administrative Law Judge Jennifer B. Millington (the "ALJ").  (AR 35–52.)  On June 3, 2020,

12 the ALJ issued a decision denying benefits.  (AR 16–33.)  On November 5, 2020, the Appeals

13 Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the

14 Commissioner.  (AR 2–9.)

15     Plaintiff initiated this action in federal court on January 8, 2021, and seeks judicial review

16 of the denial of her applications for disability benefits and SSI.  (ECF No. 1.)  The Commissioner

17 lodged the operative administrative record on September 28, 2021.  (ECF No. 14.)  On January

18 21, 2022, Plaintiff filed an opening brief.  (ECF No. 19.)  On February 22, 2022, Defendant filed

19 a brief in opposition.  (ECF No. 20.)  On March 10, 2022, Plaintiff filed a reply.  (ECF No. 21.)

20

21

**III.**

**LEGAL STANDARD**

22     **A.**     **The Disability Standard**

23     To qualify for disability insurance benefits under the Social Security Act, the claimant

24 must show that he is unable "to engage in any substantial gainful activity by reason of any

25 medically determinable physical or mental impairment[3] which can be expected to result in death

26

27

---

[2] For ease of reference, the Court will refer to the administrative record by the pagination provided by the Commissioner and as referred to by the parties, and not the ECF pagination.  However, the Court will refer to the parties' briefings by their ECF pagination.

28

[3] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities

2

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled.  20 C.F.R. § 404.1520;[4] Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work?  If so, proceed to step three.  If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1?  If so, the claimant is disabled.  If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work?  If so, the claimant is not disabled.  If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).  The burden of proof is on the claimant at steps one through four.  Ford v. Saul, 950 F.3d 1141, 1148 (9th Cir. 2020).  A claimant establishes a *prima facie* case of qualifying disability once he has carried the burden of proof from step one through step four.

Before making the step four determination, the ALJ first must determine the claimant's RFC.  20 C.F.R. § 416.920(e); Nowden v. Berryhill, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his]

---

that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

[4] The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. §§ 404.1501 et seq.; however, Plaintiff is also seeking supplemental security income, 20 C.F.R. §§ 416.901 et seq.  The regulations are generally the same for both types of benefits.  Therefore, further references herein are generally to the disability insurance benefits regulations, 20 C.F.R. §§ 404.1501 et seq.

limitations" and represents an assessment "based on all the relevant evidence."   20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).   The RFC must consider all of the claimant's impairments, including those that are not severe.   20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("S.S.R.") 96–8p.

An RFC determination is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.   See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."   Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001).

At step five, the burden shifts to the Commissioner, who must then show that there are a significant number of jobs in the national economy that the claimant can perform given her RFC, age, education, and work experience.   20 C.F.R. § 416.912(g); Lounsburry v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006).   To do this, the ALJ can either use the Medical Vocational Guidelines ("grids") or call a vocational expert ("VE").   See 20 C.F.R. § 404 Subpt. P, App. 2; Lounsburry, 468 F.3d at 1114; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).   "Throughout the five-step evaluation, the ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.' "   Ford, 950 F.3d at 1149 (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

**B.     Standard of Review**

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.   42 U.S.C. § 405(g).   In determining whether to reverse an ALJ's decision, the Court reviews only those issues raised by the party challenging the decision. See Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir. 2001). Further, the Court's review of the Commissioner's decision is a limited one; the Court must find the Commissioner's decision conclusive if it is supported by substantial evidence.   42 U.S.C. 405(g); Biestek v. Berryhill, 139 S. Ct. 1148, 1153 (2019).   "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."   Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002) (quoting Flaten

4

v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)); see also Dickinson v. Zurko, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard). "[T]he threshold for such evidentiary sufficiency is not high." Biestek, 139 S. Ct. at 1154. Rather, "[s]ubstantial evidence means more than a scintilla, but less than a preponderance; it is an extremely deferential standard." Thomas v. CalPortland Co. (CalPortland Co.), 993 F.3d 1204, 1208 (9th Cir. 2021) (internal quotations and citations omitted); see also Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996). Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is harmless. Stout, 454 F.3d at 1055–56. Moreover, the burden of showing that an error is not harmless "normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

Finally, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). Nor may the Court affirm the ALJ on a ground upon which he did not rely; rather, the Court may review only the reasons stated by the ALJ in his decision. Orn, 495 F.3d at 630; see also Connett, 340 F.3d at 874. Nonetheless, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's; rather, if the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." Ford, 950 F.3d at 1154 (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).

**IV.**

**RELEVANT EVIDENCE**

### A.    Plaintiff's Treating Physicians

This is a somewhat unusual case, in that the majority of medical records upon which Plaintiff relies relates to treatment occurring several years prior to Plaintiff's alleged onset date and initiation of her benefits claims. Indeed, many of these records were generated pursuant to a California worker's compensation claim following a slip and fall incident occurring on July 30, 2003, in which Plaintiff injured her right shoulder and face. (See AR 279.) As an initial matter, therefore, the Court addresses the ALJ's treatment of those records.

Case 1:21-cv-00030-SAB   Document 22   Filed 07/27/22   Page 6 of 36

Here, the ALJ correctly noted she was not permitted to provide an analysis of decisions by other governmental agencies or non-governmental entities, disability examiner findings, or statements on issues reserved to the Commissioner—as the SSA deems such evidence neither inherently valuable nor persuasive—but was instead required to consider only the medical opinions and prior administrative medical findings.[5]  Further, the ALJ noted Plaintiff's medical evidence occurring prior to her alleged onset date could only be considered to the extent that it demonstrates the longitudinal history of Plaintiff's impairments and relates to Plaintiff's abilities and limitations during the period of alleged disability (i.e., April 1, 2017 (date of onset) to June 3, 2020 (date of decision)).  This approach also appears permissible in law.[6]  Accordingly, in

---

[5] Since Plaintiff filed her claims on December 14, 2017, the revised SSA regulations (effective March 27, 2017) apply.  As relevant to Plaintiff's worker's compensation-related records, 20 C.F.R. § 404.1504 provides: "Other governmental agencies and nongovernmental entities—such as . . . State agencies. . .—make disability, blindness, employability, Medicaid, workers' compensation, and other benefits decisions for their own programs using their own rules.  Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules.  Therefore, in claims filed (see § 404.614) on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits.  However, we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim in accordance with § 404.1513(a)(1) through (4)."  20 C.F.R. § 404.1504; see also Alvarez v. Colvin, 562 Fed. App'x. 553 (9th Cir. 2014) (citing 20 C.F.R. § 404.1504) ("An ALJ is 'not bound' by a physician's finding that a claimant 'was temporarily totally disabled for purposes of California workers' compensation.' "); Booth v. Barnhart, 181 F. Supp. 2d 1099, 1105 (C.D. Cal. 2002) (discussing the differences in terminology between California workers' compensation guidelines and Social Security disability, and noting an ALJ "may accept or reject medical opinions developed in non-Social-Security contexts" but "may not disregard an otherwise legitimate medical opinion 'simply because it was initially elicited in a state workers' compensation proceeding, or because it is couched in the terminology used in such proceedings.' ").

[6] The Ninth Circuit has not directly addressed this issue.  However, other courts in this District have declined to reverse an ALJ's decision on the basis that medical opinions predating the date of disability onset were not expressly considered and this Court finds those cases persuasive.  See Thomas v. Berryhill, No. 1:16-cv-01337-JLT, 2018 WL 534012, at *5–6 (E.D. Cal. Jan. 24, 2018) (ALJ did not err in failing to address treating physician's opinion related to a prior application for benefits, which predated date of onset for instant matter); Dotson v. Astrue, No. 1:10-cv-00243 SKO, 2011 WL 1883468, at *6–8 (E.D. Cal. May 16, 2011) (same, concluding opinion that predated the onset date by almost a year was "stale and not time-relevant to Plaintiff's current claim of disability."); see also Fair v. Bowen, 885 F.2d 597, 600, 606 (9th Cir. 1989) (ALJ did not err by barely mentioning and according little or no weight to consult opinion conducted for prior application for benefits that was denied but not contested by the plaintiff, and which predated the period at issue and was thus only relevant to "[plaintiff's] burden of proving that his condition [had] worsened since [the prior application's date of decision]."); but see also 20 C.F.R. § 416.920 (noting SSA "will consider all evidence in [claimant's] case record . . ."); DeBoard v. Comm'r of Soc. Sec., 211 Fed. App'x 411, 414 (6th Cir. 2006) (declining to find that "all evidence or medical records predating the alleged date of the onset of disability . . . are necessarily irrelevant or automatically barred from consideration by res judicata," and instead finding that, in some cases, such evidence "when evaluated in combination with later evidence, may help establish disability . . . particularly . . . when the disabling condition is progressive.") (emphasis in original); and Burks–Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993) (finding ALJ's "mere allowance" of evidence from the

6

summarizing the relevant medical evidence, the Court also notes the distinction between Plaintiff's medical records predating the date of onset and those occurring during the period directly relevant to the instant claims.

    1.   <u>Medical Treatment Prior to Alleged Onset Date (Pre-April 1, 2017)</u>

Plaintiff injured her right shoulder and face during a fall on July 30, 2003, while working as a housekeeping supervisor at John's Incredible Pizza.  (AR 278–79.)  Thereafter, her worker's compensation claim related to treatment of her right shoulder and lumbar spine.  A September 2003 MRI showed a herniated disc at L5-S1; a repeat MRI demonstrated a central disc herniation at L5-S1 with degenerative changes.  (<u>See</u> AR 279.)

Plaintiff underwent her first surgery on the Right L5-S1 on June 17, 2004.  Treatment notes reflect Plaintiff did not have significant improvement post-op.  (<u>See</u> AR 280.)  She received an epidural injection at L5-S1 on August 15, 2005.  (<u>See id.</u>)  A September 2005 lumbar spine MRI revealed a large disc protrusion at L5-S1 with lateral and neural foraminal extension of disc material on the left, felt to be highly clinically symptomatic.  (<u>See</u> AR 279.)

On August 31, 2006, Plaintiff underwent her second surgery, at the L4-S1.  (<u>See</u> AR 280.)

On May 22, 2007, Dr. Kahmann, a spinal surgery specialist who notes his "practice [is] limited to surgery of the spine," conducted a QME and opined there was no need for additional lumbar spine surgery.  He diagnosed Plaintiff with status/post posterior lumbar interbody fusion at L4-5, L5-S1; chronic low back pain and leg pain; Grade 1 spondylolisthesis at L4-5; degenerative disc disease at L4-5 and L5-S1, and status/post at right L5-S1 microdiscectomy.  Also in July 2007, an EMG/NCS of the lower extremities revealed normal results.  In 2008, however, Dr. Dureza, Plaintiff's primary care physician, recommended further surgery.  (<u>See</u> AR 314.)  During the decade that followed, Plaintiff's doctors continued to debate whether a third spine surgery was warranted, and Plaintiff appears to have vacillated between pursuing and not pursuing the surgery:

- On February 21, 2009, Dr. Anderson, an orthopedic surgeon, provided a PQME in

record of a prior claim was permissible because such evidence "may be relevant to a claim of disability with a later onset date.").

7

which he suggested he agreed with Dr. Kahmann's opinion but found a second opinion regarding getting a spine surgery consult was reasonable.  (See id.)

- In June 2009, a cervical spine MRI showed slight loss of normal lordosis, multilevel degenerative changes, small central disc protrusions at C3-4 and C4-5, and demonstrated widely patent neural foramina.  (See AR 279.)

- In December 2009, a CT scan of the lumbar spine showed s/p placement bilateral pedicle screws and posterior fusion L4-S1 with residual grade anterolisthesis L4-L5; mild central spinal stenosis at L3-4 with a slight transverse compression of the thecal sac and encroachment upon the exiting nerve roots.  (See id.)

- In February 2010, Dr. Lattice (specialty unknown) provided a second opinion also recommending surgery.  (See AR 314.)

- In August 2011, Dr. Anderson provided a PQME re-evaluation of Plaintiff's right shoulder and lumbar spine.[7]  Plaintiff complained mainly of her lumbar spine; when she sits for a long period of time, pain radiates down both legs with occasional numbness; pain is daily and increases with coughing or sneezing, vacuuming, mopping, bending and stooping; the back pain is occasionally severe enough that she has falls; because of the back pain, she has weakness and cramping in the legs and feet; the pain wakes her up every night; and her 22-year old daughter who lives at home does pretty much all of the inside cleaning activities.  She said she could stand for about 30 minutes, sit for 30 minutes (but on long drives, she can sit in the car for 1-1.5 hours before needing to stop for a break), and walk for about two hours; she can drive herself around town.  She said her shoulder hurts with heavy pushing/pulling or moving her arm very quickly, and she cannot sleep on her side.  Plaintiff reported that in spring 2009, she began working at Wallin Funeral Homes doing housekeeping; she works two hours a day, five days a week, and always brings either her husband or daughter with her

---

[7] Dr. Anderson noted that, Plaintiff's daughter also attended the appointment and, although no interpreter was present, Plaintiff's "English was very good and I do not believe the history or exam suffered."

to help with the heavy activities such as vacuuming and mopping; she is able to do the light activities such as furniture polishing.  At that time, Plaintiff reported walking 25 to 30 minutes every day.  Dr. Anderson determined from 2011 MRIs that Plaintiff had a possible partial rotator cuff tear and lumbar disc disorder status/post at L5-S1.  On physical exam, Dr. Anderson noted Plaintiff walked without any evidence of a limp; she had 2/4 tenderness at L3-S1 and over bilateral S1 joints; 50% normal forward flexion and lateral side bending, but no extension; heel and toe walking intact; straight leg raising negative to 70 degrees with a negative Lasegue maneuver.  Plaintiff's shoulder had 2/4 tenderness at the rotator cuff; motor, sensory, and reflex exams were normal; and there were no signs of carpal tunnel, trigger fingers, or deQuervain's syndrome.  Dr. Anderson opined Plaintiff "is functional and can work to the degree that she can and so she is very reticent to undergo a lumbar fusion procedure again."  (AR 399–404.)

- In September 2011, Dr. Anderson again opined that, "if the fusion is solid, I do not see the reason for further surgery, especially given the patient's concerns."  He expressed uncertainty as to whether Drs. Dureza and Lettice had reviewed Plaintiff's most recent MRI studies, and recommended a Panel QME spine surgeon might need to issue a recommendation to "help sort . . . out" the "dueling opinions referable to the need for further surgery."  (AR 396–97.)

- In October 2011, a post-surgical MRI of the lumbar spine showed placement of the pedicle screws were in a satisfactory position, neural foramina relatively patent, thecal sac is intact, and abnormal signal posterior paraspinal soft tissues with some enhancement consistent with recent surgery, but no discrete enhancement of epidural space; 3.6 mm right paracentral disc bulge at T12-L1; mild anterior wedging and degenerative disc disease at thoracolumbar junction; neural foramina widely patent at L1-L4, with no evidence of nerve root or thecal sac compression.  (See AR 279, 392–93.)

- On October 24, 2011, Dr. Dureza indicated in treatment notes that he told Plaintiff

there was no guarantee that surgery would return her to 100% pre-injury functional capacity, but that he felt the surgery was her best chance of returning to some form of gainful employment.  Dr. Dureza notes Plaintiff agreed with him about surgery and wanted to proceed as soon as possible.  (AR 394.)

- In November 2011, an examination by Dr. Dureza yielded diagnoses of herniated disc cervical spine; herniated disc lumbosacral spine; post laminectomy syndrome; lumbar radiculitis/neuritis; and impingement syndrome in the right shoulder.  Dr. Dureza continued to recommend spinal surgery.  (AR 382.)

- In April 2012, Dr. Kahmann issued a medical evaluation in which he opined Plaintiff's "symptoms more or less remained the same [since October 2008].  She continues to complain of pain in her lower back and both lower extremities.  She has no new symptoms.  She feels the magnitude of pain has increased somewhat.  Her symptoms are increased with activity, better with rest."  He reviewed a CT scan of Plaintiff's lumbar spine and noted a "solid fusion" at L4-5 and L5-S1 and "no additional pathology at the level of the proximal fusion at L2-3 or L3-4."  He diagnosed Plaintiff with status-post L4 to sacrum fusion, solidly fused; chronic lower back and leg pain; Grade 1 spondylolisthesis, L4-5; degenerative disc disease at L4-5 and L5-S1; and a status-post right L5-S1 discectomy.  Dr. Kahmann again opined that surgery was not required.  (AR 313–15.)

- An April 25, 2012 treatment note from Dr. Dureza noted Plaintiff's tenderness at the paraspinal, bilateral SI joints; positive Faber's, positive Patrick's; decreased range of motion; AC joint tenderness in right shoulder; continued to recommend revision lumbar spine fusion surgery.  (See AR 280.)

Plaintiff never proceeded with a third back surgery.  Thereafter, the following objective clinical findings were reviewed:

- In May 2012, an MRI of Plaintiff's right shoulder showed a partial tear of the supraspinatus tendon; intensity along infraspinatus muscle suggestive of a sprain; and degenerative changes.

- In July 2014, images of the cervical spine showed spasm and mild osteoarthritic changes of the cervical spine, but was otherwise deemed a normal cervical spine series. (AR 1239.)

- In August 2015, images of the L5-S1 level showed the vertebral body heights and alignments were normal; decreased intervertebral disc spaces at the L4-5 and L5-S1 levels; Laminectomy defects at the L4 and L5 levels; L4-5 disc spacer; bilateral lateral fusion present with bone grafting and pedicle screws and stabilizing rods at the L4, L5, and S1 levels; and osteoarthritic changes in the lumbosacral spine. (AR 1238.)

- In September 2015, an MRI of the lumbar spine revealed normal lordotic curvature and no acute fracture. Impression was degenerative disease in the lumbar spine; prior anterior discectomy and fusion as well as posterior laminectomy and fusion at L3-L4 and L4-L5; and moderate and severe left neural foraminal stenosis and mild lateral recess stenosis at L2-3. (AR 843–44.)

- February 2016 x-rays of Plaintiff's left and right hip showed no acute fractures or dislocations, and mild osteoarthritic changes. (AR 615, 618.)

- November 2016 x-rays of Plaintiff's cervical spine revealed all normal findings, with unremarkable soft tissue structures; impression was minimal degenerative changes. (AR 608, 1218.)

- December 2016 x-rays of the pelvis revealed a "normal female pelvis." (AR 611.)

Meanwhile, from 2009 to the relevant disability period, Plaintiff continued to regularly see her treating physicians for treatment regarding her back and shoulder, as well as sometimes leg, hips and wrists, pain, and decreased mobility, with symptoms consistent with those described in most detail in Dr. Anderson's August 2011 PQME report. As treatment, she was always prescribed pain medications, including Prilosec, Norco, Soma, Terocin lotion, Ketoprofen, Cyclobenzaprine, and Tramadol, was often advised to apply either ice or a warm compress to the affected areas. (See, e.g., AR 280, 423–24, 478, 488, 493–96, 498, 508, 514–17, 526–29, 531–37, 548–51, 585–90; see also AR 537 (diagnosed with chronic pain disorder July 2016).)

1    Infrequently, she received injections to treat her pain.  (See AR 280 (Aug. 2005, L5-S1

2    and generally for pain); AR 508, 512 (Oct. 2016, shoulder); AR 506 (Nov. 2016, neck); AR 485

3    (Dec. 2016, wrists).)

4    Rarely, she was referred to physical therapy.  (AR 280 (through 2012, generally); 506

5    (Nov. 2016).)

6    Plaintiff also frequently visited her doctors with various and ongoing complaints of

7    GERD, heartburn, cough, and other cold symptoms, and to renew her prescription medications.

8    Physical examinations conducted during those visits almost always yielded normal results, often

9    including normal musculoskeletal results finding "no back pain or arthritis . . . or reduced range

10   of motion is noted."  (See, e.g., AR 467–70, 472–75, 505, 519–23, 536, 540–45, 553–58, 561–63,

11   566–69, 572–75, 578–83, 589, 592–96, 599–602, 644–45, 647, 650–52, 653–55, 656–58.)

12       2.   Medical Treatment During Relevant Period (April 1, 2017, to June 3, 2020)

13   After filing her Social Security application in December 2017, through March 2020,

14   Plaintiff continued seeking treatment from her doctors for her various ailments, such as GERD

15   and related issues (e.g., nausea, constipation, acid reflux, abdominal pain),[8] cold and flu

16   symptoms, painful urination, allergic rhinitis (headache, fatigue, and nausea), or for general

17   checkups and to renew her prescription medications.  When treated for these matters, Plaintiff's

18   physical exams regularly yielded normal results, often including normal musculoskeletal results

19   (such as findings of no evidence of bony tenderness, joint effusion, enlargement, or abnormal

20   motion; and no muscle fasciculation, atrophy, muscle weakness, asymmetry or reduced range of

21   motion; or findings of no back pain or arthritis).  Plaintiff was regularly observed as healthy and

22   well-nourished, not in apparent distress, and ambulating normally.  (See, e.g., AR 628–30, 640–

23   42, 666–71, 682–87, 699–704, 742, 751, 763, 772, 783, 828–30, 831–33, 846–53, 864–72, 873–

24   81, 899, 908, 916, 942–50, 959–68, 978–86, 1045–46, 1037–38, 1054–61, 1063–70, 1070–71,

25   1078, 1096–1102, 1123–29, 1159–65, 1196.)

26   _____

27   [8] In January 2018, a gastric antrum biopsy was performed in treatment of Plaintiff's hiatal hernia, erosive gastritis, gastric polyps, and reflux esophagitis.  There were no complications.  Post procedure, Plaintiff was counseled on

28   GERD, her complaints and associated medical conditions, and was directed to make lifestyle modifications, to follow anti-reflux measures and GERD diet, and continue current medications.  (AR 630, 632–39.)

Plaintiff was also referred for some clinical testing:

- January 2018 x-rays were taken pursuant to complaints of chronic left knee pain; the impression was minimal left knee arthritis.  (AR 461, 605, 1217.)

- April 17, 2018 x-rays of the shoulder showed calcific tendonitis of the left shoulder region; injections were recommended; no evidence of acute bony injury was found.  X-rays of the cervical and lumbar spine showed degenerative disc disease, but no evidence of acute bony injury ("bony alignment is within normal limits."); the impression was degenerative changes.  A chest x-ray showed no significant acute processes.  (AR 716, 723, 809–10, 812–15, 1232–34.)

- September 26, 2019 x-rays of the left knee showed mild to moderate osteoarthritic changes, but otherwise a normal left knee.  (AR 1079.)

- November 20, 2019 x-rays of the lumbosacral spine showed an old anterior wedge compression fracture of L1; decreased intervertebral disc spaces at the L1-2 and L2-3 levels; bilateral pedicle screws and stabilizing rods at the L4, L5, and S1 levels; L5 laminectomy; L4-5 and L5-S1 disc spacers; osteoarthritic change of the lumbosacral spine present; and the vertebral body alignment was normal.  (AR 1079.)

Plaintiff also very frequently continued to seek treatment from her doctors for her back/neck/shoulder/leg/hips/wrists pain.  For example, on August 12, 2019, Plaintiff complained of back pain.  She was advised to take medication and rest initially, and then slowly increase her activity level.  (AR 926–34.)

On March 13, 2020, Plaintiff met with her doctor for a "medication check."  (AR 846.)  At that time, Plaintiff reported no significant weight change, no chest pain, no increase in frequency of urination, no rash, no weakness, and normal activity legal and respiration.  (AR 853.)  A physical exam yielded results that Plaintiff was healthy-appearing and well-nourished, not appearing in distress, and ambulating normally.  She was counseled on diet and exercise and prescribed supplements for a vitamin D deficiency.  (AR 854.)

On April 13, 2020, Plaintiff was examined by Dr. Otchere of Spinal Care Inc.[9]   (AR 1225–28, 1230.)  The treatment notes indicate Plaintiff complained of lower back pain radiating to the legs, rated at a 10/10 and worsening with walking, standing, and sitting; weakness; trouble sleeping; headaches; pain and stiffness in the neck; leg cramps and varicose veins.  Plaintiff reported her previous treatments—lumbar injections from 2016 and chiropractor visits in 2019—did not help, but that physical therapy in 2019 did help.  The physical exam yielded no apparent distress; mild swelling at the left knee; limited range of motion in the lumbar flexion and extension due to pain; an antalgic gait; tenderness at the spinous process and paraspinous muscles in the lumbar segment, and left knee; strength at 5/5 levels; sensations all within normal limits; and a positive slump test.  Plaintiff was negatively screened for depression.  Plaintiff was assessed with worsening chronic low back pain with associated bilateral radicular pain symptoms, evidence of an L1 compression fracture and worsening left knee pain that is significantly limiting Plaintiff's mobility.  Plaintiff was treated with a steroid injection in her left knee; she reported her knee pain reduced after the injection from a 7/10 to a 4/10.  Dr. Otchere discussed a pain medication titration plan, in which Plaintiff indicated her goal was opioid therapy treatment.  Dr. Otchere also discussed potential future treatment options, including Kyphoplasty of the L1 segment and a spinal cord stimulation trial for pain and functional improvement, "in light of failure to conservative and surgical treatments."  Nothing in the record, including her testimony at the hearing, indicates whether Plaintiff intended to proceed with either treatment, or whether she did proceed with either recommended treatment.

On April 23, 2020, Plaintiff had an initial appointment with Dr. Siddhartha Agrawal, of South Valley Vascular.  (AR 1221–22.)  Plaintiff complained that painful varicose veins affected her daily lifestyle, such as standing for only fifteen minutes and walking for two blocks.  The general exam yielded no acute distress.  Plaintiff was assessed with varicose veins and chronic venous hypertension with inflammation of bilateral lower extremity.  Dr. Agrawal recommended venaseal treatment, which applies a medical adhesive to permanently close the diseased vein.

---

[9] The record only contains this one treatment note from Dr. Otchere.  It is unclear whether the visit represents a new patient visit or if Plaintiff was previously examined by Dr. Otchere on other occasions.

Plaintiff indicated she wished to proceed, and a follow up appointment was to be set for mid-May 2020.  Nothing in the record, including Plaintiff's testimony at the hearing, indicates whether the procedure was completed.

Plaintiff also sought treatment for generalized depression and anxiety, which was treated with limited psychotherapy and medication management.  (AR 1169–76 (Aug. 1, 2018, psychotherapy); see also AR 1132 (Sept. 18, 2018, same, also assessed with generalized anxiety disorder; mental status exam yielded depressed and tearful but all else within normal limits; treated with medications); AR 1106–07 (Oct. 1, 2018, mental status exam yielded depressed/anxious mood but all else within normal limits, treated with medications); AR 935–42 (Jul. 9, 2019, assessed with generalized anxiety disorder and major depression, single episode; treated with supportive therapy and was directed to follow up with a therapist).)

On a few documented instances, Plaintiff complained that oral medications were ineffective and received injection treatments.  For example, on May 28, 2019, Plaintiff complained that naproxen didn't work, but that she tried Celebrex and it was "working well." Plaintiff received an injection in her ankle and other pain medications.  (AR 942, 950; see also AR 801 (Feb. 5, 2018, knee injection); AR 699–704 (May 11, 2018, knee injection); AR 918, 925–26 (Aug. 28, 2019, shoulder injection).)

Even more rarely, Plaintiff was referred for physical therapy.  (See AR 969–78 (Apr. 25, 2019, assessed with no contractures, malalignment, or bony abnormalities and normal movement of all extremities and tenderness; referred to PT for neck, back and bilateral leg pain); AR 909–17 (Sept. 25, 2019, exam yielded normal ambulation, no apparent distress; referred to PT for lower back pain, counseled on diet and exercise).)

During the majority of her appointments, however, Plaintiff's treatment nearly always included the prescription of pain medications, often with instructions for diet and exercise; and sometimes Plaintiff was directed to apply heat or ice on the affected areas.  For example, on April 2, 2018, Plaintiff complained of cervical and lumbar spine pain at an 8/10, radiating from the neck; symptoms reportedly began 11 years ago as a result of living a heavy object.  Plaintiff claimed constant, worsening pain with moderate-severe aching and burning, occurring constantly

with intermittent worsening; best pain at a 4/10; worst pain at a 10/10.  It was noted Plaintiff had treated with epidural steroids, consulted a chiropractor, and "has not had any pertinent therapy for this condition."  The physical exam yielded misaligned cervical spine, tenderness at thoracic and lumbar spine, all ranges of motion showing moderate pain with motion.  Plaintiff was assessed with segmental and somatic dysfunction of cervical region and directed to treat with ice.  (AR 734, 740, 741; see also AR 726–32 (Apr. 16, 2018, same assessment and treatment, pain at a 7/10); AR 708–14 (May 8, 2018, same assessment and treatment, pain at a 9/10); AR 691–97 (May 21, 2018, same assessment and treatment, pain at an 8/10); AR 674–80 (Jun. 5, 2018, same assessment and treatment, pain at a 5/10); AR 1187 (Jul. 26, 2018, Plaintiff complained she was unable to do a lot of physical therapy because of back pain, was encouraged to continue with diet and physical activity); AR 1029–37 (Feb. 28, 2019, physical exam yielded neck was non-tender; normal movement of all extremities, and normal findings); AR 1021–28 (Mar. 11, 2019, neck pain, assessed with cervical somatic dysfunction, directed to apply ice and do home exercises); AR 987–95 (Apr. 9, 2019, same); AR 959–68 (May 16, 2019, assessment of multiple joint pain, prescribed ibuprofen); AR 873–81 (Jan. 2, 2020, complaint of allergic rhinitis, no apparent distress, prescribed medications, diet and exercise); AR 864–72 (Feb. 14, 2020, same).)

A number of times, treatment notes indicated Plaintiff complained that her pain medications were not helping much and that her symptoms were getting worse, but that she did not want another surgery.  The physical exams during these appointments showed Plaintiff appeared healthy and well-nourished, was not in apparent distress, and was ambulating normally.  She was assessed with multiple joint pain, an old healed anterior wedge fracture of vertebra, and disc degeneration in the lumbar region.  Treatment consisted of prescribing medications, counseling Plaintiff on diet and exercise, and referring her to pain management.  (See, e.g., AR 881–90 (Nov. 22, 2019); AR 854–63 (Mar. 6, 2020).)

### B.   Reviewing State Agency Physicians G. Dale and P. Frye

In March 2018, Dr. Dale reviewed the record at the initial level and issued a medical opinion.  (AR 55–63, 69–74.)  Dr. Dale opined that Plaintiff is able to perform light work: she can occasionally lift/carry and push/pull up to twenty pounds; frequently lift/carry and push/pull up to

ten pounds; stand and walk six hours per eight-hour day; sit for six hours per eight-hour day; frequently climb ramps and stairs, and balance; and occasionally climb ladders, ropes, or scaffolds, stoop, kneel, crouch, and crawl.  Dr. Dale based his opinion on consideration of Plaintiff's ADLs, the location, duration, frequency and intensity of Plaintiff's pain and other symptoms, her medication and other treatment, the longitudinal treatment records and apparent lack of treatment seeking behavior.

In July 2018, Dr. P. Frye, reviewed the medical record on reconsideration and issued a similar opinion.  (AR 83–87, 94–98.)  In reaching this opinion, Dr. Frye noted Plaintiff alleged no change or new conditions since her initial application; her updated medical records included treatment notes with a chiropractor, which documented slight shoulder pain and mild osteoarthritis; and there was no indication of any medical opinion from any medical source.

The ALJ found the opinions of Drs. Dale and Frye were persuasive because they were consistent with Plaintiff's treatment records and objective medical testing, and because Drs. Dale and Frye are familiar with the Social Security Administration's rules and regulations.  (AR 27.)

### C.   Plaintiff's Testimony

In her disability application, Plaintiff claims that a spinal fusion, arthritis, high blood pressure, and a hernia prevent her from working.  (AR 224.)  The application indicates Plaintiff cannot speak and understand English; that she has a ninth-grade education level; that she worked eight hours a day as a restaurant manager from 1998 to 2005; and she worked three hours per day as a housekeeper for a funeral home from 2005 to 2017.  (AR 223–25.)  At both her position at the restaurant and at the funeral home, Plaintiff would walk, stand, sit, climb, stoop, kneel, crouch, crawl, handle, grab, or grasp big objects, reach, and write, type or handle small objects without limits.  (AR 236–37.)  In her housekeeper position, Plaintiff would clean furniture, windows and mirrors, polish, sweep and mop, and clean the waiting rooms, offices, and restrooms.  (AR 237.)   At the time of her initial application, she was receiving treatment for physical conditions only.  (AR 227.)  This included knee, chest, back, pelvis, leg, and hip pain, which Plaintiff has lived with for over thirteen years and describes as "ongoing and coming all the time," constantly, consistently, with no relief.  (AR 228–33, 239–40.)  Plaintiff takes or has

17

taken hydrocodone, soma, carisoprodol, Vicodin, naproxen, and Advil for her pain, but the relief is "very low." (AR 240.) Side effects include migraines, nausea, constipation, agitation, and ulcers. As of the date of her initial application, Plaintiff was not attempting to use surgery to relieve her pain. (AR 241.) Plaintiff has two canes and back supports that assist her in standing.[10] (Id.) On the check-the-box application, Plaintiff indicates she is able to do errands such as going to the Post Office or grocery store without assistance, but also that she needs assistance to do errands such as "grocery shopping, household chores." (AR 242.) Plaintiff indicated she could walk two blocks, depending on the swelling of her leg, sit for fifteen to forty minutes at a time, and she needs someone else to drive her places. (Id.)

On her disability appeal application, Plaintiff indicates there was no change in her conditions or her daily activities, and she has no new conditions. (AR 247, 251.)

At the May 6, 2020 hearing, Plaintiff testified she was 59 years old; she has an 8th grade education level from Guatemala; and that she speaks English and can read and write a little English, but Spanish is her first language. (AR 40–41.) She lives with her husband and adult daughter. (AR 44.) The most recent job she held was as a supervisor in the housekeeping department for John's Incredible Pizza Company. (AR 43.) Plaintiff traveled to the different restaurants to make sure the cleaning centers in each restaurant remained clean. (Id.) She would lift 30 or 40 pounds; bend down "a lot"; vacuum, and mop with a "heavy mop." (Id.) Plaintiff testified that the vacuuming and mopping were very hard for her because her legs would get swollen and she would fall. (Id.) Plaintiff needed to take strong medications after three hours of work to mitigate her pain; over time, the medications got "stronger and stronger." (AR 43–44.) Side effects from the medications included making Plaintiff feel like she was "drunk," and damaging her stomach. (AR 44.) Plaintiff stopped working in 2017. (AR 43.)

Plaintiff's doctor told her that her weight is damaging her spine and she needs to take walks (Plaintiff weighs approximately 200 lbs. with a BMI of 39.06); but Plaintiff testified she can't because she will fall. (AR 44–45.) She can drive, but not for more than fifteen minutes

---

[10] Defendant notes the medical records do not reflect that these assisting devices were prescribed by any medical provider. An independent review of the record confirms the absence of such prescription.

"because if I do it I could fall."[11]  (AR 45.)  She can stand for about ten to twenty minutes.  (Id.)  She can do some cooking and some cleaning—including dusting, washing dishes, and folding some clothes—but she cannot sweep, mop, or vacuum.  (Id.)  Plaintiff testified that the pain makes it difficult to focus and concentrate, and that she cannot sleep for more than three hours unless she takes medications for sleeping.  (AR 45–46.)

### D.      The ALJ's Decision

The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. §§ 404.1520, 416.920.  (AR 23–29.)  At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from her alleged disability onset date of April 1, 2017, through the date of the decision (Jun. 3, 2020).  (AR 24.)  At step two, the ALJ found Plaintiff had the severe impairments of (1) degenerative disc disease and history of laminectomy and fusion, (2) compression fracture of the lumbar spine, (3) osteoarthritis of the hips, (4) obesity, (5) chronic pain syndrome, (6) left shoulder tendinitis/bursitis, (7) varicose veins in the lower extremities, (8) gastritis, (9) GERD, (10) hiatal hernia, and (11) uterine prolapse.  (Id. (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).)  The ALJ also found Plaintiff's medically determinable mental impairments of depressive disorder and anxiety disorder did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and were therefore nonsevere.  (AR 25.)

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 404.920(d), 404.925, 404.926.  (Id.)  The ALJ explained Plaintiff's impairments did not meet the criteria of listing 1.02 (major dysfunction of a joint) because Plaintiff retained the ability to ambulate effectively, and treatment records indicate she is capable of walking a sufficient distance to be able to carry out activities of daily living.  (AR 26.)  The ALJ found Plaintiff's impairments did not meet the criteria of listing 1.04 because, although Plaintiff has a disorder of the spine, it has not resulted in compromise of a nerve root, loss of

---

[11] It is possible that, due to the language barrier, Plaintiff meant to express that she could *walk* for only approximately fifteen minutes at a time, or else she could fall.

motor function, and a positive straight-leg raise, nor do Plaintiff's treatment records indicate evidence of nerve root involvement.  (Id.)

Before proceeding to step four, the ALJ determined Plaintiff's RFC permitted her to perform "light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except [Plaintiff] is able to occasionally climb ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl; frequently climb stairs and ramps; and frequently balance.  (Id.)

At step four, the ALJ found Plaintiff capable of performing past relevant work as an executive housekeeper (DOT 187.167-046, light exertion, SVP 8), as that job is generally performed, because that job "does not require the performance of work-related activities precluded by [Plaintiff's] residual functional capacity."  (AR 29 (citing 20 C.F.R. §§ 404.1565, 416.965).)  Therefore, the ALJ found Plaintiff was not under a disability at any time from April 1, 2017, through the date of decision, June 3, 2020.  (Id. (citing 20 C.F.R. §§ 404.1520(f), 416.920(f)).)

**V.**

**DISCUSSION AND ANALYSIS**

Plaintiff raises two issues on appeal: (1) whether the ALJ erred in the evaluation of Plaintiff's testimony; and (2) whether the ALJ erred in the residual functional capacity determination.[12]  (ECF No. 19 at 2.)  The Court will address Plaintiff's arguments in turn.

**A.     Whether the ALJ Erred in the Evaluation of Plaintiff's Symptom Testimony**

1.     Legal Standard

The ALJ is responsible for determining credibility,[13] resolving conflicts in medical testimony, and resolving ambiguities.  Andrews, 53 F.3d at 1039.  A claimant's statements of

---

[12] As Defendant correctly observes, Plaintiff does not raise any issues with respect to the ALJ's evaluation of the medical opinion evidence and the finding that Drs. Dale and Frye's opinions were most persuasive.  Accordingly, the Court only considers the issues presently before it, and any issues not raised on appeal are deemed waived.  Lewis, 236 F.3d at 517 n.13; see also Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir. 2003) (stating court "will not consider any claims that were not actually argued in appellant's opening brief" and will only "review . . . issues which are argued specifically and distinctly in a party's opening brief.").

[13] S.S.R. 16-3p applies to disability applications heard by the agency on or after March 28, 2016.  Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities."  S.S.R. 16-3p at 1-2.

pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); S.S.R. 16-3p; see also Orn, 495 F.3d at 635 ("An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment.").

Rather, an ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. See Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014); Smolen, 80 F.3d at 1281; S.S.R 16-3p at 3. First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. Garrison, 759 F.3d at 1014; Smolen, 80 F.3d at 1281–82. If the claimant satisfies the first step and there is no evidence of malingering, "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so." Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (citations omitted).

> If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints. In this regard, questions of credibility and resolutions of conflicts in the testimony are functions solely of the Secretary.

Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009) (quotation omitted); see also Lambert, 980 F.3d at 1277; Brown-Hunter v. Colvin, 806 F.3d 487, 494 (9th Cir. 2015) (ALJ may not simply conclude the claimant is not credible and then summarize the medical evidence supporting her RFC determination; this is insufficient to meet the "specific reasons" standard required to "ensure that the claimant's testimony was not arbitrarily discredited."); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102–03 (9th Cir. 2014) (quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995) (standard not met where ALJ did not specifically identify the parts of testimony he found not credible and why, but only made the single "boilerplate" statement that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."); Holohan v. Massanari, 246 F.3d 1195, 1208

(9th Cir. 2001) (concluding "that the ALJ's credibility determination was erroneous" because it was based on the ALJ' characterization of "the 'record in general' ").

Medical evidence is "a relevant factor in determining the severity of a claimant's pain and its disabling effects," but "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." Burch, 400 F.3d at 680–81; Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). "The rationale for this restriction is that pain testimony may establish greater limitations than can medical evidence alone." Burch, 400 F.3d at 680 (citing S.S.R. 96–7p (1996)). Thus, the ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of her symptoms; statements and other information from medical providers and other third parties; and any other relevant evidence included in the individual's administrative record. S.S.R. 16-3p at 5. Additional factors an ALJ may consider include the location, duration, and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; conflicts between the claimant's testimony and the claimant's conduct—such as daily activities, work record, or an unexplained failure to pursue or follow treatment—as well as ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, internal contradictions in the claimant's statements and testimony, and other testimony by the claimant that appears less than candid. See Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014); Tommasetti, 533 F.3d at 1039; Lingenfelter v. Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007); Smolen, 80 F.3d at 1284.

Finally, so long as substantial evidence supports the ALJ's assessment of a claimant's subjective complaint, the Court "will not engage in second-guessing." Thomas, 278 F.3d at 959.

2.    Analysis

Here, as noted, the ALJ determined Plaintiff had the severe impairments of (1) degenerative disc disease and history of laminectomy and fusion, (2) compression fracture of the lumbar spine, (3) osteoarthritis of the hips, (4) obesity, (5) chronic pain syndrome, (6) left shoulder tendinitis/bursitis, (7) varicose veins in the lower extremities, (8) gastritis, (9) GERD,

(10) hiatal hernia, and (11) uterine prolapse.  (AR 24.)  The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ concluded Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.

Plaintiff argues the ALJ erred in discounting her testimony because: (1) she failed to make sufficiently specific findings and address objective evidence contrary to her credibility conclusion; (2) she failed to make sufficiently specific findings to rely on Plaintiff's daily activities as a basis for rejecting her testimony; and (3) substantial evidence does not support her reliance on Plaintiff's "conservative" treatment as a basis for rejecting Plaintiff's testimony. (ECF No. 19 at 18–22.)  The Court addresses each argument in turn.

### a.   Inconsistencies With the Medical Evidence

### i.   Identifying Plaintiff's Testimony

First, Plaintiff argues the ALJ failed to identify the specific portions of her testimony which were being discounted, and thus fails to comply with the "specific reasons" standard.  (See ECF No. 19 at 18.)  The Court disagrees.  On the face of her decision, the ALJ specifically identifies Plaintiff's testimony that she is only able to stand for fifteen minutes at a time due to her impairments, and is therefore prevented from working.  (AR 27 (citing hearing testimony at AR 45 and disability application at AR 224).)  Plaintiff acknowledges this in her opening brief.[14]

---

[14] Perhaps Plaintiff expected more portions of her testimony to be identified, even though that is not the legal standard.  To that point, however, the Court is inclined to note that Plaintiff's symptom testimony appears to be extremely limited in the record.  For example, the entirety of Plaintiff's hearing testimony is contained in less than seven pages of transcript (see AR 40–46): the majority of this testimony relates to describing Plaintiff's former work and activities; as to symptoms, Plaintiff only testifies that she has to take a lot of strong medications (AR 43–44), she cannot stand for more than 15 minutes (AR 45)—although Plaintiff also later states at the hearing that she can stand for fifteen to twenty minutes, and at another time, she states she can only stand for ten minutes—and that her pain is so debilitating that she cannot focus or concentrate through the day and cannot sleep for more than three hours (AR 45–46).  Plaintiff's disability application is similarly scarce on information, as Plaintiff provided one-word answers to many of the write-in portions of the form, confusingly checked boxes attesting to statements on the form which contradicted each other, and left other substantial portions of the form blank.  Indeed, some of Plaintiff's responses in her disability application are so vague they are nonresponsive.  For example, to the question "What brings the pain on? (Please be very specific)," Plaintiff responds, "Consistent no relief, live with me it falls asleep with me and gets up with me" (AR 240); to the question "How much medicine do you take?" Plaintiff responds, "too much" (id.); to the question "What are your usual daily activities now that you have some pain? (walking, shopping, household chores, driving, socializing, etc.)" Plaintiff responds, "as much as possible" (AR 241); and so on.  Thus, it appears that the ALJ identified the testimony she could from the existing record.  But that is, essentially, the point of this

1  (ECF No. 19 at 18.)  Thus, the ALJ complied with the first part of the "specific, clear, and

2  convincing reasons" standard, that is, "to specifically identify the testimony [from a claimant] she

3  or he finds not to be credible."  Lambert, 980 F.3d at 1277; Brown-Hunter, 806 F.3d at 494.

4      ii.    Identifying Evidence in the Record that Undermines Plaintiff's Testimony

5         Next, the ALJ was required to explain what evidence undermines the identified testimony.

6  Id.  Plaintiff argues the ALJ failed to sufficiently "link" the evidence to Plaintiff's testimony.[15]

7  (ECF No. 19 at 18.)    Again, the Court disagrees.    The ALJ indicates in her decision that

8  Plaintiff's statement "concerning the intensity, persistence, and limiting effects of these

9  symptoms"—i.e., Plaintiff's testimony as to her standing limitation—"[is] not entirely consistent

10  with the medical evidence and other evidence in the record." (AR 27.)  The ALJ then proceeds to

11  set forth a summary of Plaintiff's medical records, in which she highlights a number of treatment

12  records that she finds to be inconsistent with "the degree [of limitation] alleged" in Plaintiff's

13  testimony:

> Objective medical testing of the lumbar spine well before the
> claimant's alleged onset date showed decreased disc spaces from
> L4 through S1 and osteoarthritis changes (Ex. 15F at 4 [AR 1238
> (referencing Aug. 2015 impressions of lumbosacral spine images)]).
> In January 2017, shortly before the claimant's alleged onset date,
> treatment notes indicate that she was having cold-like symptoms

---

18,19  case; namely, Plaintiff makes only general statements that the pain from her impairments is so strong and "constant" (AR 240) that it is completely debilitating and prevents Plaintiff from working, and the ALJ takes issue with this overly generalized assertion as unsupported by the cumulative record.

20  [15] Plaintiff relies on Burrell v. Colvin, 775 F.3d 1133 (9th Cir. 2014), for the statement that the ALJ was required to "link purported inconsistencies in the medical record to Plaintiff's testimony she found not credible" (ECF No. 19 at 18 (emphasis in original)) because the Burrell court found the "ALJ committed legal error because they 'never connected the medical record to Claimant's testimony' or made 'a specific finding linking a lack of medical records to Claimant's testimony' " (id. (quoting Burrell, 775 F.3d at 1139)).  It is not entirely clear what more Plaintiff contends the ALJ was required to do to meet this "linking" requirement.  Moreover, it appears Plaintiff misconstrues the findings in Burrell, and the "linking" requirement as Plaintiff characterizes it is not the legal standard required here.  In Burrell, the ALJ found the claimant's testimony that she had one or two headaches a week was inconsistent with the medical records because no treatment records relating to the claimant's headaches, neck, or back pain after October 2008 existed, thus creating a gap in treatment from September 7, 2007, to September 2, 2008.  Burrell, 775 F.3d at 1138–39.  But the court determined this statement was made in error because treatment records during that time period did, in fact, exist.  Id. at 1139.  Thus, in noting the ALJ's misstatement regarding the existence of treatment records, the court determined the ALJ "did not make a specific finding linking a lack of medical records to Claimant's testimony about the intensity of her back, neck, and head pain."  Id.  It does not appear the Burrell court intended to alter the specific, clear and convincing reasons standard in this case.  Further, the Court notes the circumstances in Burrell are distinguishable from the instant matter, as this Court has confirmed the ALJ's summary and characterization of the medical record—including the ALJ's comment that no medical provider issued an opinion during the relevant period setting forth Plaintiff's limitations—is accurate.

but her physical and mental examination was otherwise normal (Ex. 4F at 3 [AR 469]).  In January 2018, the claimant was found to have no physical complaints, including no back pain or arthritis (Ex. 5F at 2 [AR 629]).  She was also found to be in no apparent distress and the only positive finding noted was some localized tenderness in the abdomen (Ex. 5F at 2–3 [AR 629–30]).  In April 2018 and June 2018, the claimant was treated for acute sinus symptoms and her physical examination was normal, including the abdomen and musculoskeletal system (Ex. 7F at 6, 60 [AR 672, 725]).  In April 2020, the claimant complained of muscle pain and back pain with radiation despite recently undergoing lumbar fusion surgery (Ex. 13F at 3 [AR 1226]).  The claimant was also given a steroid injection for her left knee (Id. at 5 [AR 1228]).  Objective medical testing from April 2018 of the thoracic region found degenerative changes and an x-ray of the left shoulder found soft tissue calcification consistent with tendinitis (Ex. 14F at 3 [AR 1233]).

(AR 27.)  Upon review of the record, the Court finds the ALJ fairly describes the longitudinal history of Plaintiff's impairments and summarizes the medical occurrences in Plaintiff's records for the relevant period, with specific references to the record in support of her findings.  Thus, the ALJ "pointed to specific evidence in the record," Valentine, 574 F.3d at 693; Lambert, 980 F.3d at 1277, that undermined Plaintiff's claims that her pain was so severe she was unable to stand for more than fifteen minutes.

Additionally, the ALJ determined that, "[g]iven the claimant's allegations of totally disabling symptoms, it is reasonable to find some indication in the treatment records of functional restrictions placed on the claimant by a treating physician.  Yet a review of the record in this case reveals no restrictions recommended by a treating physician."  (AR 28.)  This comment, which Plaintiff does not address in her briefing, is well-taken.  See 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled."); see also Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (noting the burden to establish disability through step four lies with the claimant, "It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.").  The fact that none of Plaintiff's treating physicians provided a "function-by-function" opinion indicating Plaintiff is disabled or has any limitations greater than those set forth in the ALJ's RFC (such as Plaintiff's fifteen-minute standing limitation)[16]

---

[16] This includes consideration of the treatment notes of Dr. Otchere, as discussed in greater detail herein.

1   suggests that, after conducting their examinations of her and reviewing the objective clinical

2   findings, Plaintiff's doctors did not find her impairments to be "completely disabling."

3          On such a record, the Court finds the ALJ made sufficiently specific references to the

4   portions of Plaintiff's testimony that she was discounting, and provided sufficiently clear and

5   convincing reasons based on specific references to the objective medical evidence in the record

6   for doing so.  Lambert, 980 F.3d at 1277.  Accordingly, the ALJ's ultimate conclusion that the

7   limited adverse clinical findings noted in Plaintiff's "largely normal" treatment records "would

8   not [have] limited [Plaintiff] to less than light exertional activities" (AR 28) is supported by

9   substantial evidence.

10          iii.    Accounting for the Whole Record

11          Finally, Plaintiff argues the ALJ failed to review the whole record and instead "cherry-

12   picked" evidence by failing to expressly discuss the objective findings in the April 2020 medical

13   records of Dr. Otchere, of Spinal Care Inc.—specifically, the findings of "swelling in Plaintiff's

14   left leg, tenderness and mild swelling of her left knee, that she had an antalgic gait, that she had

15   limited lumbar flexion and extension due to pain, tenderness throughout the lumbar region, and a

16   Slump Test was positive bilaterally"—and Dr. Otchere's comment in the treatment note that there

17   was "radiographic evidence of [an] L1 compression fracture and worsening left knee pain that is

18   significant[ly] limiting [Plaintiff's] mobility."  (ECF No. 19 at 18–19 (citing AR 1227–28).)

19   Plaintiff argues the ALJ's failure to expressly address these statements amounts to "ignoring

20   competent evidence in the record that suggest an opposite result."  (ECF No. 19 at 19.)

21          An ALJ may not consider only evidence that supports a non-disability determination and

22   disregard evidence that supports a finding of disability.  See, e.g., Garrison v. Colvin, 759 F.3d

23   995, 1018 (9th Cir. 2014) ("While ALJs obviously must rely on examples to show why they do

24   not believe that a claimant is credible, the data points they choose must in fact constitute

25   examples of a broader development to satisfy the applicable 'clear and convincing' standard."

26   (emphasis in original)); Holohan, 246 F.3d at 1207 (finding that "the ALJ's specific reason for

27   rejecting [a physician's] medical opinion [was] not supported by substantial evidence" because, in

28   part, "the ALJ selectively relied on some entries in [the plaintiff's] records . . . and ignored the

1    many others that indicated continued, severe impairment").

2         Here, the ALJ expressly references Dr. Otchere's April 2020 treatment notes in her

3    decision (as previously quoted verbatim), noting Plaintiff's complaints of muscle and back pain

4    and that Dr. Otchere gave Plaintiff a steroid injection for her left knee.  (AR 27 (citing AR 1226,

5    1228 (Ex. 13 F at 3, 5)).)  Indeed, Plaintiff acknowledges the ALJ's discussion of Dr. Otchere's

6    records in her opening brief.  (ECF No. 19 at 19.)  Based on the ALJ's specific reference to and

7    discussion of Dr. Otchere's treatment notes in her decision, the Court cannot conclude that the

8    ALJ ignored Dr. Otchere's medical notes.   See Valentine, 574 F.3d at 691–92 (rejecting

9    plaintiff's arguments the ALJ ignored medical records where findings from those records were

10   discussed in the ALJ's decision).

11        Plaintiff's argument that the ALJ "failed to discuss Dr. Otchere's finding that there is

12   'radiographic evidence of [an] L1 compression fracture' " is similarly without merit.  Importantly,

13   the Court notes it is unclear what evidence Dr. Otchere is referring to, as he does not identify the

14   source of this information in his record and merely notes Plaintiff's last reported physical exam

15   occurred in 2019.  (AR 1225, 1228.)  However, it appears most plausible that Dr. Otchere is

16   referring to the November 20, 2019 x-rays of Plaintiff's lumbosacral spine, which showed an "old

17   anterior wedge compression fracture of L1."  (AR 1079.)  The remainder of findings as to this

18   "old" compression fracture, which are not acknowledged by Plaintiff, indicate the vertebral body

19   alignment is normal and the lumbosacral spine merely shows osteoarthritic changes.  (Id.)  In any

20   event, it is plain the ALJ considered this evidence, as one of the severe impairments she identified

21   during her RFC determination was Plaintiff's "compression fracture of the lumbar spine."  (AR

22   24.)

23        Nor does the Court find the ALJ impermissibly "cherry-picked" statements from Dr.

24   Otchere's records and ignored contrary medical evidence.  First, as Defendant appropriately

25   points out, Plaintiff's April 13, 2020 encounter with Dr. Otchere is only one of myriad medical

26   visits within the relevant disability period, not to mention the decade of medical visits prior to

27   that.  Thus, even if Dr. Otchere's treatment note was to be construed as medical evidence that

28   supports a finding of disability, see, e.g., Garrison, 759 F. 3d at 1018, it lacks persuasiveness

27

where it is not consistent with the "broader development" of the medical evidence.  That is, as the Court previously discussed, the greater majority of Plaintiff's medical records do not indicate the severity of impairments Plaintiff contends are assessed by Dr. Otchere, but instead demonstrate Plaintiff's impairments were adequately treated with prescription medications, physical therapy, and "apply[ing] ice to the affected areas."  (See, e.g., AR 674–80, 691–97, 708–14, 726–32, 734, 740, 741, 959–68, 987–95, 1021–28.)

Second, the Court is not persuaded that Dr. Otchere's treatment note would or should be characterized as a "medical opinion" as Plaintiff suggests.  Notably, Dr. Otchere does not opine or provide diagnosis as to Plaintiff's functional capacity.  His one statement that Plaintiff's L1 compression fracture and worsening left knee pain is "significant[ly] limiting her mobility" (see AR 1228) does not set forth any specific functional limitation but is instead vague and conclusory, and not inconsistent with the limitations identified in the ALJ's RFC determination. See Valentine, 574 F.3d at 691–92 (finding ALJ properly ignored examining psychologist's assessment noting claimant was "less likely to have difficulty with highly routinely, overlearned tasks with low cognitive demand," as it was "neither a diagnosis nor statement of [the plaintiff's] functional capacity . . . The ALJ therefore did not err by excluding it from the RFC.")  Moreover, there is no indication that this portion of Dr. Otchere's assessment is supported by any medical evidence.   It is unclear whether Dr. Otchere conducted any objective tests or physical examinations of Plaintiff beyond the one instance included in the April 2020 record, and Dr. Otchere does not identify what prior records of Plaintiff's, if any, he reviewed in support of his assessment.   Instead, the majority of the medical findings appears to be derived from the subjective symptomology reported by Plaintiff and her own recounting of her medical history.[17] (See AR 1225–26); see also Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1228 (9th Cir. 2009) (ALJ need not accept opinion of physician that is "brief, conclusory and inadequately supported by clinical findings."); Ghanim, 763 F.3d at 1162 ("If a treating provider's opinions are based to a large extent on an applicant's self-reports and not on clinical evidence, and the ALJ

---

[17] This includes the portion of Dr. Otchere's assessment that Plaintiff's chronic low back pain and left knee pain is "worsening," as Dr. Otchere's singular treatment note does not indicate he reviewed any prior medical records or previously treated Plaintiff so as to establish any basis for comparison regarding the severity of Plaintiff's symptoms.

1    finds the applicant not credible, the ALJ may discount the treating provider's opinion") (internal

2    citation omitted).

3         Third, to the extent Dr. Otchere provided objective findings that Plaintiff's left knee

4    showed mild swelling, that her lumbar range of motion was limited due to pain, that both were

5    tender to palpation, or that her gait was antalgic, the Court notes these findings are substantially

6    similar to the objective findings recorded in many of Plaintiff's treatment notes occurring

7    between April 16, 2018, and February 14, 2020, which resulted in the prescription of pain

8    medications and directions to treat with ice.[18]  There is no question that the ALJ considered and

9    addressed these similar records in reaching her RFC determination; therefore, the Court declines

10   to find the ALJ erred to the extent that she did not directly address Dr. Otchere's similar objective

11   findings.  See Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (acknowledging the Ninth

12   Circuit cases "do not require ALJs to perform a line-by-line exegesis of the claimant's testimony,

13   nor do they require ALJs to draft dissertations when denying benefits."); see also Treichler, 775

14   F.3d at 1103 ("[T]he ALJ's analysis need not be extensive."); Mongeur v. Heckler, 722 F.2d

15   1033, 1040 (2d Cir. 1983) ("An ALJ need not recite every piece of evidence that contributed to

16   the decision, so long as the record "permits us to glean the rationale of an ALJ's decision.' ").

17   Here, as previously noted, the Court finds the ALJ fairly summarized the longitudinal medical

18   records and represented Plaintiff's history of treatment of impairments accurately.  Moreover, the

19   rationale for the ALJ's decision is clear: the cumulative medical evidence does not document

20   clinical abnormalities or treatment reasonably consistent with Plaintiff's allegations of completely

21   debilitating pain symptoms.  Finally, the Court finds it noteworthy that these prior similar records

22   were considered by Drs. Dale and Frye in their medical opinions, that the ALJ found those

23   opinions "persuasive," and that Plaintiff neither produced a competing medical opinion for the

24   ALJ to weigh against the opinions of Drs. Dale and Frye, nor, on appeal, does she challenge the

25

---

26   [18] (See, e.g., AR 734, 740, 741 (Apr. 2, 2018, pain at 8/10, radiating from neck, constant, worsening with moderate-
     severe aching and burning; exam yielded misaligned cervical spine, tenderness at thoracic and lumbar spine, all
27   ranges of motion showing moderate pain with motion; assessed with segmental and somatic dysfunction of cervical
     region); AR 726–32 (Apr. 16, 2018, same assessment and treatment, pain at a 7/10); AR 708–14 (May 8, 2018, same
28   assessment and treatment, pain at a 9/10); AR 691–97 (May 21, 2018, same assessment and treatment, pain at an
     8/10); and AR 674–80 (Jun. 5, 2018, same assessment and treatment, pain at a 5/10).)

1  ALJ's evaluation of the medical opinion evidence, thus effectively waiving that particular issue.

2  Lewis, 236 F.3d at 517 n.13; Indep. Towers of Wash., 350 F.3d at 929.

3  On this record, substantial evidence supports the ALJ's finding that Plaintiff's allegations

4  of disabling pain were inconsistent with the objective medical evidence in the record, which

5  showed generally normal examinations and a lack of medical opinion evidence supporting

6  disability.  Although the ALJ cannot discredit Plaintiff's pain testimony solely because it is found

7  not to be supported by the objective medical evidence, Rollins, 261 F.3d at 857 (citing 20 C.F.R.

8  § 404.1529(c)(2)); Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991), the Court finds the

9  ALJ has provided other reasons to reject Plaintiff's testimony, as discussed herein. Therefore, the

10  ALJ could properly consider that Plaintiff's complaints were inconsistent with clinical

11  evaluations, thus satisfying the requirement of stating a clear and convincing reason for

12  discrediting Plaintiff's testimony.  Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294,

13  1297 (9th Cir. 1999).

14  **b.  Activities of Daily Living (ADLs)**

15  The Ninth Circuit has held that "[e]ngaging in daily activities that are incompatible with

16  the severity of symptoms alleged can support an adverse credibility determination."  Ghanim, 763

17  F.3d at 1165.  In order to reach such a conclusion, the Ninth Circuit generally requires the ALJ to

18  describe the daily activities, note whether the claimant performs them alone or with assistance,

19  and evaluate whether the nature of each activity "comprise[s] a 'substantial' portion of [the

20  claimant's] day, or [is] 'transferrable' to a work environment."  Id.  However, even where a

21  claimant's activities "suggest some difficulty functioning, they may [still] be grounds for

22  discrediting the claimant's testimony to the extent that they contradict claims of a totally

23  debilitating impairment."  Molina v. Astrue, 674 F.3d 1104, 1112–13, superseded by regulation

24  on other grounds (citing Turner, 613 F.3d at 1225; Valentine, 574 F.3d at 693).

25  Here, the ALJ considered Plaintiff's testimony with respect to her ADLs (driving,

26  cooking, cleaning, shopping—as long as her activity is limited to short periods—as well as going

27  to doctor's appointments, handling her own medical care, self-care, and personal hygiene, and

28  spending time with friends and family), which the ALJ concluded were not limited to the extent

30

1    one would expect, given Plaintiff's complaints of completely disabling symptoms and limitations.

2    (AR 25, 28.)

3         Plaintiff argues the ADLs identified by the ALJ—which are limited to such short

4    durations (e.g., Plaintiff can only perform activities for fifteen minutes at a time)—do not provide

5    a basis for an adverse credibility determination because the ALJ has not shown they are physical

6    functions sufficiently transferrable to a work setting, so as to demonstrate Plaintiff's ability to

7    perform work within the RFC.  (ECF No. 19 at 19–20.)

8         But this argument appears to miss the mark, nor does it appear consistent with the

9    foregoing authorities.  Namely, it does not appear to this Court that the ALJ's comment on

10   Plaintiff's ADLs was meant to establish Plaintiff's ability to perform work within the RFC;

11   rather, it appears the ALJ is noting the inconsistency between Plaintiff's allegations of "totally

12   debilitating impairments" and the objective medical evidence (or lack thereof).  See Molina, 674

13   F.3d at 1113.  Indeed, this circumstance appears analogous to Valentine v. Commissioner of

14   Social Security Administration, 574 F.3d 685, 693 (9th Cir. 2009).

15        In Valentine, the ALJ determined the claimant "demonstrated better abilities than he

16   acknowledged in his written statements and testimony" and that his "non-work activities . . . are

17   inconsistent with the degree of impairment he alleges."  Valentine, 574 F.3d at 693.  The ALJ

18   further remarked on the claimant's ADLs, but acknowledged these activities did not suggest that

19   the claimant could return to his old job.  Id.  Instead, the ALJ indicated she thought the ADLs

20   suggested the claimant's later claims about the severity of his limitations were exaggerated.  Id.

21   The Ninth Circuit found the ALJ provided clear and convincing reasons to reject the claimant's

22   subjective complaint testimony because she identified evidence that directly contradicted the

23   claimant's contentions about how debilitating his fatigue was.  Id.

24        Similarly here, it appears the ALJ's observation that Plaintiff's reported activities of

25   driving, cooking, cleaning, shopping, going to doctor's appointments, handling her own medical

26   care, self-care, and personal hygiene, and spending time with friends and family appear to be

27   inconsistent with the degree of impairment she alleges—namely, constant, completely debilitating

28   pain.  Thus, this Court similarly concludes the ALJ's resolution between conflicting evidence

provides a clear and convincing reason to reject Plaintiff's subjective testimony.  See id.  In sum, the Court finds the ALJ properly considered Plaintiff's statements to medical providers and hearing testimony that appear inconsistent with her testimony regarding the totally disabling effects of her pain symptoms.  See Robbins, 466 F.3d at 884 (conflicting or inconsistent statements can contribute to an adverse credibility finding); Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997), as amended on reh'g (Sept. 17, 1997) (credibility determination can be based on conflicts between the claimant's testimony and her own conduct, or on internal contradictions in that testimony).

   **c.**  **Characterization of Plaintiff's Treatment as "Conservative"**

  Evidence that a claimant's medical treatment was relatively conservative may properly be considered in evaluating a claimant's subjective complaints.  See Tommasetti, 533 F.3d at 1039–40; Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007).  ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.") (citation omitted); see also Burch, 400 F.3d at 681 ("The ALJ is permitted to consider lack of treatment in his credibility determination.").

  Here, the ALJ considered the overall nature of Plaintiff's treatment—which, following Plaintiff's June 17, 2004 and August 31, 2006 surgeries to present, has overwhelmingly consisted of pain medications with directions to treat with ice or heat (see, e.g., AR 674–80, 691–97, 708–14, 726–32, 734, 740, 741, 959–68, 987–95, 1021–28), punctuated by infrequent steroidal injections (see, e.g., AR 699–704, 801, 918, 925–26, 942, 950), physical therapy (see, e.g., AR 909–17, 969–78), and apparently one chiropractic consult appointment, with unknown results (see AR 734).  The ALJ characterized this treatment as "essentially routine and conservative in nature." (AR 28.)  Such characterization is supported in law.[19]  Accordingly, the ALJ concluded

---

[19] See Martin v. Colvin, No. 1:15-cv-01678-SKO, 2017 WL 615196, at *10 (E.D. Cal. Feb. 14, 2017) ("[T]he fact that Plaintiff has been prescribed narcotic medication or received injections does not negate the reasonableness of the ALJ's finding that Plaintiff's treatment as a whole was conservative, particularly when undertaken in addition to other, less invasive treatment methods."); Zaldana v. Colvin, No. CV 13-7820 RNB, 2014 WL 4929023, at *2 (C.D. Cal. Oct. 1, 2014) (finding that evidence of treatment including Tramadol, ibuprofen, and "multiple steroid injections" was a legally sufficient reason on which the ALJ could properly rely in support of his adverse credibility determination); Walter v. Astrue, No. EDCV 09-1569 AGR, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (ALJ permissibly discredited claimant's allegations based on conservative treatment consisting of Vicodin, physical therapy, and an injection); see also Hensley v. Comm'r of Soc. Sec., No. 1:20-cv-01361-SAB, 2022 WL 597578, at

Plaintiff's overall treatment method was not consistent with "the type of medical treatment one would expect for an individual with [Plaintiff's] alleged limitations" due to completely debilitating pain. (AR 28.)

Plaintiff argues the ALJ erred in characterizing her treatment as "conservative" because she failed to consider the fact that Plaintiff previously endured two back surgeries. (ECF No. 19 at 21.) However, this argument is unpersuasive. The ALJ did not characterize all of Plaintiff's treatment (including the surgeries) as conservative, but rather noted the longitudinal record spanning over a decade—but in particular, Plaintiff's treatment during the relevant time period—demonstrated Plaintiff's treatment was "essentially routine and conservative in nature." This finding is supported by the medical record, as the Court has extensively described, *supra*.

Nor does the Court find the ALJ was required to include Plaintiff's prior surgeries in her assessment of the nature of Plaintiff's current treatment of her alleged impairments. This is because the surgeries were performed in 2004 and 2006, over ten years prior to the alleged onset date of disability, and are therefore only relevant for purposes of considering the longitudinal history of Plaintiff's impairments, and as they relate to her abilities and limitations during the period of alleged disability (*i.e.*, April 1, 2017 (date of onset) to June 3, 2020 (date of decision)). See Thomas v. Berryhill, 2018 WL 534012, at *5–6 (no error in not addressing opinion which predated onset date); Dotson, 2011 WL 1883468, at *6–8 (opinion that predated the onset date by almost a year was "stale and not time-relevant to Plaintiff's current claim of disability"); Fair, 885 F.2d at 600, 606 (no error in barely mentioning and according little or no weight to consult opinion which predated the period and did not demonstrate worsening condition); see also DeBoard, 211 Fed. App'x at 414 (medical evidence predating onset may be relevant to establish disability where the disabling condition is progressive). Furthermore, the surgeries do not appear to relate to Plaintiff's abilities and limitations during the relevant period of alleged disability because, after Plaintiff underwent the surgeries, she was able to continue working for several years thereafter. See, e.g., Valentine, 574 at 692–93 (rejecting opinion that claimant was

---

*16 (E.D. Cal. Feb. 28, 2022) (upholding ALJ's characterization of opioid pain medication, nerve block injections, and epidural steroid injections as "conservative," based on treatment records as a whole).

"unemployable" due to impairments while claimant was continuing to work full time).

Plaintiff also argues the ALJ's decision fails to account for Dr. Otchere's April 2020 treatment plan for Plaintiff, which involves another surgical procedure, a "kyphoplasty."[20]   (ECF No. 19 at 21 (citing AR 1228).)  But for the reasons previously discussed, the Court finds the ALJ did not ignore Dr. Otchere's treatment notes but instead adequately addressed them and impliedly discounted them to the extent she deemed the medical opinions of Drs. Dale and Frye to be more persuasive and consistent with the cumulative body of medical records—an evaluation of the medical opinions based on the record which, again, Plaintiff has not contested on appeal.[21]

On this record, the Court finds the ALJ's characterization of Plaintiff's treatment as "essentially routine and conservative in nature" is supported by specific and substantial evidence in the record.  Thus, the ALJ has sufficiently identified clear and convincing reasons in support of her determination that Plaintiff's treatment is inconsistent with the severity of her alleged symptoms.  Burrell, 775 F.3d at 1136; S.S.R. 16-3p at *10.  While Plaintiff has suggested an alternative interpretation of the evidence, this is not sufficient to establish reversible error.  See Ford, 950 F.3d at 1154; Burch, 400 F.3d at 679 (citations omitted).  Accordingly, the Court finds the ALJ provided clear and convincing reasons supported by substantial evidence for discounting

---

[20] See Carefusion Corp. v. Medtronic, Inc., No. 10 CV-01111-LHK, 2010 WL 4509821, at *1, *4 (N.D. Cal. Nov. 1, 2010). (in antitrust case based on allegations that defendant artificially raised the prices on its kyphoplasty products, defining kyphoplasty as "a minimally invasive vertebral compression fracture treatment procedure, involving . . . creating a void in the vertebral body by the insertion and inflation of a balloon, and then inserting bone cement or bone paste into the void.").  Based on the creators' own characterization of kyphoplasty as a "minimally invasive" procedure, the Court is hesitant to conclude this procedure constitutes an "aggressive" treatment for purposes of the instant appeal.  Indeed, the kyphoplasty procedure appears to be a less aggressive surgical option than the third lumbar fusion surgery previously recommended to Plaintiff.

[21] It is perhaps also noteworthy that nowhere in the record, including Dr. Otchere's notes, is there any indication that Plaintiff agreed to proceed with the kyphoplasty surgery or that she did, in fact, proceed with the surgery.  Plaintiff's opening brief—which does not constitute medical evidence that was properly considered by the ALJ—confusingly argues that Plaintiff had "good reasons" to not want to proceed with the surgery, while also suggesting that the surgery is necessary based on Plaintiff's debilitating symptoms.  (See ECF No. 19 at 21.)  Of course, the latter suggestion is contradicted in the record, by the fact that Plaintiff never proceeded with another surgery, despite it being recommended by Dr. Dureza since 2008, and during the multiple encounters in which Plaintiff reported to her treating physicians that she did not wish to proceed with another surgery.  (See, e.g., AR 314, 396–97, 399–404, 854–63, 881–90.)  Regardless, to the extent that surgery was recommend and was a viable option, yet Plaintiff chose not to proceed with it, her failure to pursue such "necessary" treatment may be considered by the ALJ in her credibility determination and may constitute an independent specific and legitimate reason to discount Plaintiff's symptom testimony.  See Burch, 400 F.3d at 681 ("The ALJ is permitted to consider lack of treatment in his credibility determination."); Molina, 674 F.3d at 1114 (claimant's failure to assert a good reason for not seeking treatment can cast doubt on the sincerity of the claimant's pain testimony, as can a failure to seek psychiatric treatment until after the claimant applies for disability benefits).

1   Plaintiff's pain testimony.

2         **B.**      **Whether the ALJ Erred in the Residual Functional Capacity Determination**

3         As previously, noted, residual functional capacity is what a person "can still do despite

4   [the individual's] limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

5   Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (RFC reflects current "physical and mental

6   capabilities").

7         Plaintiff argues the ALJ erred in the RFC determination because she failed to consider Dr.

8   Otchere's April 2020 examination notes in reaching the RFC determination.  (ECF No. 19 at 22–

9   24.)  This argument is cumulative of Plaintiff's prior argument that the ALJ failed to consider Dr.

10  Otchere's treatment note when she discounted Plaintiff's symptomology evidence, and the Court

11  finds it to be unavailing for the same reasons previously discussed.

12        In sum, the ALJ neither improperly rejected nor ignored evidence in reaching the RFC

13  determination.  Rather, the Court finds the RFC is supported by the substantial evidence

14  contained in Plaintiff's medical records, and it is consistent with the opinions of Drs. Dale and

15  Frye, which the ALJ relied upon as "persuasive"—an evaluation of the medical opinions which

16  Plaintiff has not challenged.  Based on the aforementioned analysis, the Court finds the ALJ did

17  not err in determining that Plaintiff retained the RFC to perform her past work as an executive

18  housekeeper (light work), as it is generally performed.

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1

2

**VI.**

**CONCLUSION AND ORDER**

For the foregoing reasons, the Court finds the ALJ's decision to be supported by substantial evidence in the administrative record, and free from remandable legal error. Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Elena Elizabeth Ovando.  The Clerk of the Court is DIRECTED to CLOSE this action.

IT IS SO ORDERED.

Dated:   __July 27, 2022__

UNITED STATES MAGISTRATE JUDGE